You may proceed. Your Honors, good afternoon. If it may please the Court, we're here looking at a $7.6 million bankruptcy court award in favor of Zurich Insurance. We're looking at only two aspects of this award. I will be forced to discuss the facts at length to phrase the legal issue, but I understand that I must phrase it as a legal issue in order to have any real chance here at a reversal, and I believe that I will point out two de novo issues of law that will support my argument that this should be remanded to the bankruptcy court. Now the bankruptcy court was estimating claims. I don't think that's an important distinction here because the bankruptcy court estimated them for allowance. In other words, not just for voting purposes. We are required to pay every dollar of these claims, and the standard on review for estimation or allowance is the same. So we're really talking about a bench trial over the course of more than a week that liquidated these claims. My clients are the debtors or were the debtors in bankruptcy, and as I've briefed, we were in bankruptcy because our accountant stole the $3 million we're supposed to pay to Zurich. The FBI found him later on, and he was convicted and sentenced to more than six years in federal prison together with an award of restitution, but it put us in a difficult position. We are a professional employment organization. We basically have co-employees. We had some 15,000 at our height. We now have about 7,500, but we did survive bankruptcy, and we confirmed a plan to pay $100 to Zurich. Zurich was our workers' comp insurance provider, which is very important in this industry with so many employees, mostly in Texas, but also in many other states, and we were obligated to pay Zurich—well, I'm sorry. Zurich was obligated to pay any insurance losses over $500,000. We were one way or the other responsible for all losses up to $500,000, and for two of these policy years, they're called LRF years, loss reserve fund years. So the way that the contract worked was Zurich would estimate in advance how much, based on our number of employees, estimated future losses would be, and we were required to fund that as a reserve in advance, multiple millions of dollars at any given time, and in the nature of these worker comp claims, that they can last for many years into the future, because there's latent injuries, and even closed cases can be reopened. So we understand that Zurich wants to have a reserve there, and Zurich wants to be protected. But the point is, and the record is clear, there is no ambiguity on this, that these reserves were just that. They were reserves to be held by Zurich against our future obligations. They were not present payments. And the contract, as I've said— They were due and payable when they were submitted to you, right? They were not payable, Your Honor. They were due. We had to send it. We had to ship the funds to Zurich. No question about that. But they were just a temporary reserve to be held by Zurich. And how often did you have to make the payments? Every year, Your Honor. Every year. So like, on January 1st? Or was it specified in the contract? I don't remember the date. I know that every November there was a reassessment of how much that amount had to be, but I don't want to misrepresent the date. It was an annual deal, and once we got into our dispute with Zurich in 2015, we were current up until then. We did not pay for 2015, 2016, or 2017. So when you missed the 2015 payment, that is a bill that you should have paid? Correct. Well, it is—again, I don't want to say that it's a bill that we should have paid. It was an amount that we should have tendered to Zurich for Zurich to hold, yes. I guess my question is, why is it not a bill? Why is it no—it looks to me like it's no different than any other service provider or creditor sending a bill to your client that says, you, as of January 1st—we'll just use that as a hypothetical date—2015, you owe us X million dollars. And it's no—it could be for, in this case, lost reserves. It could be for services rendered in the calendar year 2014. It could be for anything. It's still due and payable. It's no different than a bill. I don't see— The reason why I'm having trouble answering your Honor's question is because—let's bankruptcy code is a right to a payment, a right to a payment. So that someone can hold my funds as security is not a present right to a payment. And the contract here, as I've cited, says that we are allowed to hold these funds in reserve to apply to future payments. So my fundamental legal point, my de novo review legal point, is that the bankruptcy court double-dipped her award. Why? Because the bankruptcy code does two things. It accelerates all future claims. It accelerates all rights and says, OK, what is the amount presently due and payable? And then it also defines a claim as a right to a payment. So you don't need the reserve anymore because you're getting the whole thing. That's my point, Your Honor. That's my point. The bankruptcy—so as of the trial in June 2017, we now had five, six years of real-world losses. The bankruptcy court quantified what those losses were in the amounts asserted by Zurich. We never contested that, those real-world losses. We know that John Smith broke his ankle and it cost $16,000. But in tab six in my record excerpts are three of these LRF invoices, which are for about $3 million. Again, no dispute of fact, those are reserve funds to be held in the future. We get them back, Your Honor, if magically none of these employees have any future losses, which obviously is an absurdity. We get them back. So we had a battle of the experts. We had a full-blown trial on what are the future losses. In other words, I'm Judge Jernigan. I know what the losses are as of today. I'm interested in what are the losses in the future, which because the bankruptcy court accelerates it, I must now liquidate. I can't wait and every year come back and say, I'm going to add a little bit here, take a little bit there. So let's have that battle of the experts. And she accepts my experts, Mr. Tobelman's conclusion that the future losses are $1.7 million. Well, then what she intended to do, I believe, was to say, okay, we have X for the past, we're adding Y for the future. She didn't understand or she made a mistake, I believe, which I had no ability to bring back to her attention later for reasons that I can explain. She didn't understand that 3 million of those pre-petition invoices were the LRF invoices, which were their reserve. Now Zurich says, well, the judge intended to do that. No, she did not. We have her email ruling and we have her final ruling where she rejects expressly the Zurich methodology. The Zurich methodology, by the way, their actuarial expert, this was, I was in a different world. He starts from scratch. So he goes back to 2011 and he says, okay, in 2011, I estimated the global future losses for all time for perpetuity to be X. And then I go forward every year and I keep estimating these. I never really looked at the quantified numbers. I never really looked at what the losses were. So of course . . . But you won on that one, right? Absolutely, Your Honor. I mean, the judge credited your expert over the . . . Yeah, the judge, the judge had, the judge did not credit their expert at all and she expressly finds that my expert at $1.7 million in future losses . . . So then what would be the basis to award both sets of numbers? There would be none. There would be none. If she doesn't credit their expert's theory and your expert says it's not, you would never do that, then . . . That's why I'm saying that there is reversible error here as a matter of law. Why . . . I don't understand why this couldn't have easily been brought back up. Your Honor, because we tried the plan confirmation, the Chapter 11 plan confirmation at the same time. It was a combined trial. And it was very important for us to get out of bankruptcy fast, to confirm a plan. Because of course we have customers and clients that don't like us being in bankruptcy. So because we had a unified trial and we had to get the confirmation, we couldn't just wait another six months by filing a motion to reconsider, et cetera, et cetera. So we made a decision and I don't think . . . I respect Your Honor's question, but I don't think that we should be penalized by forgoing a motion to reconsider that we had discretion to file. We had to get out of bankruptcy and we did it fast. And we understood that there was a problem with that. But if we had not gotten out of bankruptcy fast, then it would all be for nothing. Because . . . this was a record fast bankruptcy case, by the way, Your Honors. We went and we tried the whole bankruptcy case, we tried the whole claim here and some six months after I got involved, which is fast. And the bankruptcy judge accommodated us on that. But to get to my fundamental point, because I'm running out of time on this issue, there was no basis, unless this Court concludes, that the Bankruptcy Court intended to award both sets. But that's the point. If the Bankruptcy Court intended to do that, then the Bankruptcy Court violated Section 101.5A of the Bankruptcy Court, which defines what a claim is. And if we do look at the facts, and this is all on page 27 of my brief, there were 439 claims ever opened. The average claim paid out $26,000. At the time of the trial, there were only 16 open claims that were not on lien release. Limitations that attached under every state's worker comp laws. So if we credit the Bankruptcy Court's fundamental conclusion that Zurich is entitled to $4.7 million in damages, that's almost $300,000 per open claim. That's more than 10 times the historical average. If we do look at a reversible error on a question of fact, then I would submit that that number qualifies as such and that we should have a remand. So do you, this is a situation where we must remand? I would urge a remand, yes, Your Honor. I'm not suggesting that the court render, because we still need a liquidation. In other words, we still need to understand, not all of the $3 million in invoices is objectionable. There are amounts that are valid. They're called for LDF and things like that, that I won't board a court with, but it's not a huge amount. Can we go back to the nature of the payments that your client owed to Zurich? Because I'm not sure I understand your answer and how it fits into 502. Your Honor, we have— So let's make it a little bit easier, because the LRF is obviously complicated and I realize we're short on time. One plaintiff injured by the debtor, and the debtor enters a settlement agreement, so they've an enforceable contract. The plaintiff is owed a lifetime of medical payments. In November of each year, they estimate the following year, I think I'm going to need $10,000 in physical therapy and $10,000 in medical services. So in January, give me $20,000, and I'm going to spend it down as the year goes on, okay? That's not how I would work it out. May I explain? Please. If you have a settlement with a plaintiff, let's call him an employee. If you have a settlement with an employee, then there's no more need for estimation. Now we have a liquidated amount. No, no. I understand. Usually we don't have that. Usually we have employees who do not have final settlements. So yes, Zurich must estimate that based on the age of this employee and the nature of the injury, there's a likelihood that the employee will incur X in the future. Moreover, given the large number of employees, there's another possibility that claims that we thought were closed would be reopened. I completely understand. Maybe using an injury is confusing it, because I understand why my example is different than the workers' comp claims that are at issue in yours. I'm trying to understand how your theory of 502 works. Because let me just finish this question, I promise, and you can have time to answer it. I'm not going to use up all your time. No, it's okay. So, in my hypothetical, this plaintiff has a 502B actual liquidated claim for $20,000 on January 1st, right, under the settlement agreement. But then, if there's a bankruptcy, that plaintiff, I would think, could come in under 502C and ask for all of the future payments to be brought forward to net present value using some reasonable estimation of what those future payments would be. And those would be two separate claims, 502B as to what you owe me on January 1st, and then 502C as to everything that you would have otherwise paid me but for your bankruptcy. No, Your Honor. And I hate to go bankruptcy nerd on you. Please. I am a bankruptcy lawyer. No, no. That's why I asked. So, we are always dealing with 1015A, which takes any claim, no matter how unliquidated, how contingent, how disputed, and then liquidates to present. So, in your hypothetical, that plaintiff, the judge would liquidate his or her claim as of the date of the filing of bankruptcy. The 502C issue is just an estimation. It's usually applied just when you vote on a plan. So, when you have a creditor with an unliquidated claim, creditors vote by size of claim. So, the judge will frequently say, okay, I haven't tried your claim yet. I'm going to give you, for voting purposes, a claim of X. Judges can, and sometimes do, and here did, say, okay, I'm going to actually estimate it for allowance. It's always a 1015A question. In other words, as of the bankruptcy date, what is the claim accelerated to present value? 502C is just a vehicle to estimate something that's otherwise very difficult. But in my example, you'd have some of it's liquidated. So, the settlement is liquidated. So, I guess the question under your example is, does the settlement liquidate amounts for all time or does it leave a tail in the open? If it leaves a tail for the open, then yes, it must be estimated for present value. And how is it any different, the example I just gave you, how is it any different than the way that the LRF works for your client? It's not. It's not. The only difference is that the LRF is a temporary reserve that Zurich is allowed to hold for future payment. And they're allowed to estimate it. But at the end of the day, we are still liable only for actual expenses that Zurich pays out up to $500,000. If they're less than the LRF, we get the delta back. If they're more, we're liable. May I, I need to briefly address the... Counselor, I don't want you to have to rush. And so, each of you get three more minutes. You'll have three extra minutes as well because you have a whole issue that you need to address. And to cut to that other issue, it's a pure issue of contract law. What does savings mean? And again, there's no dispute under law that every state says for a worker's comp claim, there's a fee schedule, provider, you can only be paid what's in the fee schedule. Every state says, employer, debtor, you may not pay more. Every state, and in Texas, it's not criminal, but it leads to a loss of license for an insurer. It says, insurer, you may not pay more than that amount. So the question is, when Zurich would never pay more than that amount under the law because it would be illegal, and when the debtor would never pay more than that amount under the law, is there a savings? So we're not talking about voluntary payment. That happened to payments that we made before. We originally tried to get them disgorged. We did not appeal that issue. And we're not talking about estoppel or ratification. That's 25% savings contract. We have that contract. We haven't appealed that issue. The question is, can you, as a matter of law, have a savings when the law forbids you from paying anything more than that amount? Remember, in the first instance, Zurich must pay the employee. We don't. And in the second instance, we are obligated to pay Zurich only when Zurich pays out. So Zurich, their own head of billing, this wonderful lady, MD, confirmed, no, of course we would never pay anything more than fee schedule. Why would we? We're a prudent insurer, and we're not going to violate the law. Well, if Zurich would never pay it out, we would never have to reimburse Zurich. So my argument is an exceedingly simple argument. And if I lose on the argument, so be it. I have nothing more to add than that. You cannot have a savings, and savings is not defined in this contract. You cannot have a savings when you're not otherwise obligated to pay the amount. And on top of that, Zurich wrote this, not even contract, this proposal. Again, please, issues of voluntary payment, issues of estoppel, we did not appeal them. They do not apply. We're not trying to get back the money as we paid. Also watch for other code words. We're talking about a simple fee schedule review. We're not talking about complex billing. We're not contesting that. Complex billing is when a nurse or someone has to go look at it. We're not contesting PPO savings. That means that when Zurich has negotiated a lower amount in fee schedule. We're contesting only approximately 87% of the $1.7 million in fees that Zurich, under a code called 37FE&E, charged us for this because there is no savings as a matter of law. We've also argued that this is unenforceable under New York law because it is unconscionable. I understand that that's a large hurdle. I understand. But we are being asked, for example, Zurich pays nothing on a bill because the bill is illegal under state law, and we pay Zurich $25,000. That's unconscionable. But my primary argument is that there is no savings as a matter of law because we all know what savings means. The court is to construe that term according to its plain meaning, and the contract is to be construed against Zurich. Thank you, Your Honors, and thank you for the additional time. Thank you. May I please have the card? Your Honor, Trend received a fresh start through the bankruptcy process. It was able to reorganize and pursue its business. Unfortunately, Zurich is obligated on certain contracts for the next couple of decades. There are injured workers that will be paid by Zurich because they're the beneficiaries of these policies. Zurich is simply seeking reimbursement for the losses associated with these insurance policies. Is that true? Because the future losses have already been estimated and calculated for, so why isn't it double-dipping? That is the central question in this case. I'm happy to answer it. The answer is that a claim such as the one you mentioned, the actual bill would not be for the one year's worth of $20,000. It would be for the lifetime, so it's $20,000 times 20, so say $400,000. That would be an incurred loss. This program is an incurred loss program. It's not a paid loss program. It's paid loss in the first and second year. He's interested in the second and third year. I'm sorry. First and fourth year were paid loss. Second and third year were incurred loss. An incurred loss is the loss that is incurred, known, known with some degree of estimation by the claims handler, 20 years at $20,000 each. It is payable then and there, once a year, for that amount, and then if somebody wants to come in, say Trend, and either declare bankruptcy or buy out the contract, you have to accelerate, and you don't accelerate just one claim. You look at them all, and you bring in an actuary, and they build these triangles of losses. Both actuaries did this, and they tweak up all of the claims. It actually could go down a little bit, but generally speaking, it tweaks up. They use something called an LDF, and it depends on how much time has passed. You look, it's actually stipulated in the contracts, which are in the record. I can give you the sites, and it will give you the LDF levels. About two, three years in, it's about 150%. Then it goes down to 140%, 130, 120, 110. Down about eight, nine years in, it's like 3%. That's the second dip, if you will, and it's because of actuarial science. Losses develop over time. Things change. Even on, you do it to all claims, even ones that are closed and settled. That's just how you evaluate what the value is of this program. Their expert then gave a present value of that, right? Yes, he did. That was accepted by the court? That's correct. He gave a value at 1.7, Zurich gave a value a little higher, and the judge said, we'll take the lower value, the bottom end of the range that I've been presented as the 502C, the estimation for future obligations under this contract. The next 20 years' worth of invoices that won't be printed. If we waited 20 years, they would print out and they would look like 1.7. Maybe a little higher, maybe a little lower, but we have to accelerate that. We have to bring it current, and then we have to look at the fact that before they filed bankruptcy, they didn't pay our invoices. Month after month, year after year, so we had all those amounts, too. And how is it that we know then that there is no double-dipping here? Because their expert didn't mention it, that he had motive, he had opportunity to say, hey, the amount I'm talking about here, 1.7, that's duplicative of amounts that are already existing in these printed invoices. He didn't say that, and there's a reason, because it's not true. There are two different things that are being quantified, and what's important is that it's characterized as an issue of law here. If you read the opening statement, the closing statement, the pre-hearing brief, everything about the advocacy trial was that you have to add two pieces, the existing bills plus the actuarial estimates going forward. Do you recall what the printed bills were on the petition date? I'm sorry, say that again? I asked it inartfully. How much were the printed bills that had been sent to Trend on the petition date? I'm assuming it was more than 1.7, but I don't recall it off the top of my head. Oh, yeah, it's 5.7 at the time of trial. Got it. There's a six-month period, though, between the time they filed the petition date and the time of trial. It's possible, though, that some of that 5.7 came in there. So if the theory of double-dipping held, then the 1.7, they would actually be entitled to a refund, basically, right? Because the idea would be that the 1.7 should compensate for all of the future payments instead of the 5.7. We have to pick one or the other. Is that the theory of the debtor? Your Honor, I get a headache trying to figure it out. It moves around all the time. It moved around at trial. It moves around here today. I can't figure out the theory. I think it's easy to say, hey, this is 49 plus 1 is 50, 48 plus 2 is 50. That's double-dipping. There's no sense to it. There is no double-charging here. The bankruptcy court was not confused. The bankruptcy court took four days. There were nine witnesses. There were hundreds of exhibits. Three experts. The court received a master class in law-sensitive insurance billing. The parties had actuaries who had access to all the data and have extensive spreadsheets that reflect their numbers. The invoices, they stack up. There's all detail down to the very penny on each claim. There's no evidence that there was even a single charge, say $5, $50, $500, you name it, on this invoice that's also in that expert report. It just doesn't exist. And it would exist if we had double-dipping here. Counsel, why is it such a large amount for the future losses that it would be, if the bankruptcy court did intend to award over $4.6 million for the future losses, isn't that $292,000-plus per claim, which is significantly more than what claims are normally worth? And this is in the opposing counsel's brief. Can you address that, please? Yes, I can. The 4.6 is a mythical number. There's no substance to that. It's not found anywhere. I'll go with it, because that's the premise of the question. What do you mean it's a mythical number? No, let's clear that up. Because the number is 1.7. That's the future number. Now, I think he's adding that to $3 million. And the $3 million are past due incurred loss billings, the ILRF, incurred loss, LRF, loss reimbursement fund billings. So that's what he's characterizing as the 4.6. Those two are two different things. The $3 million LRF billings are past due amounts. They are liquidated. They are known. They are determined. They do not need to be estimated. I attached one in our appendix because I wanted you to see how detailed they are. There was no estimating that needed to be done. There was no actuarial science that needed to be done. You didn't need to use 502c to address that. It was just an invoice for past due, such as Your Honor suggested. Much like any other vendor, it's known. You just look at it. Is this due and payable? Is it not due and payable? What was separate is the 1.7. That is. So then why would it be so much for the future claims? You've explained that you don't believe that's the right number, but you said you would answer it with that number. Will you answer it with that number, please? Why would it be so much? The answer is that you have a couple dozen claims that are going to be open or subject to reopening for the next several years, possibly decades. You have injured workers at 120 some employers. That's who Trend essentially distributed Xerox insurance to in its PEO business model. Thousands of employees, but you're talking about a couple hundred claims. But those claims are valued at 1,000% more than the other claims have historically been? No. I'm sorry, I'm reading from the brief, so it appears, I mean, this should be something you're ready to explain exactly why it's wrong, because you knew this was coming. And I am, and there's no support for that. That's why I'm incredulous. Well, I mean, it's in there, so it's not surprising I would ask about it. I understand, Your Honor. Your Honor, you have to look at the 1.7 in relation to the 16 million overall. This was a four year program. The total losses were 16 million. That's what Michael Hayden and Mr. Lawson testified to. The 1.7 is actually not that large in comparison to the historical losses on this program, considering that it's going to be alive for the next couple of decades. It's also a function of the fact that when you're looking at it, the program, years two and three, as I mentioned, the LDFs are a little higher, so you have less mature data. You have less certainty as to how much, say, a knee injury is going to cost. So it has a larger multiplier when it's earlier in the claim rather than maybe ten years into the claim. That bill for 3.1 million, that's pre-petition unfunded reserves, isn't it? It is a pre-petition bill for amounts due and payable under the program. Under the reserves. It's a reserve amount. So it's the same issue about double dipping. Respectfully, Your Honor, it is not entirely a reserve amount. If you look at the appendix, you'll see that the line items that comprise the 3.1 million include paids, ALAE, incurreds, and incurred ALAE. So it is- How much do you think it is a reserve amount of? I'm sorry? How much do you think it is? If you don't believe the whole thing is pre-petition unpaid reserves, how much do you think was pre-petition unpaid reserves? Allow me to look at it. It's exhibit two in our appendix. The total billed amount is 2.1 million on an invoice dated April 10, 2015. It's a 27 page invoice and the answer to your question requires me to go, it's the aggregation of dozens of numbers on here. If I can direct your attention to, say, page nine of 27, if you have that exhibit. You can see there are individual claims listed on this page. And you see that the left column lists paid and it divides it between losses and ALAE, which are loss adjustment expenses, which is basically the cost of adjudicating a loss such as attorney's fees. And then the next column is reserves. And there's a loss amount and an ALAE amount. So here you can see that some of the amounts being billed are case reserves. They are incurred. They have not yet been paid to a doctor. Say a person is known to have a need for a knee surgery, they might put, say, $50,000 on reserve. But the surgery might be two months in advance, two months into the future. That doesn't mean it's not due and payable then and there, because that's how the program was structured. It's all about cash flow benefits. Sometimes they went for a paid program, and sometimes they went for an incurred loss program. And they have different financing attributes to them. I mean, ultimately, this is a, it's largely self-insurance, and Zurich is a financier of its customer's business. Zurich is the one who writes the checks. There's only a risk transfer for the very largest of claims. Zurich's going out of pocket and then needs to be reimbursed for things below 500,000. So, the structure of an incurred loss program is such that the incurred losses are payable once a year. If the court is interested, I will turn to the second issue in the case, which is about the medical cost containment. The previous argument focused on the issue of whether or not there's savings associated with one aspect of a larger process called bill review or medical cost containment or complex bill review. Many names for the same topic, which is you have hundreds of workers with all these medical bills. We've all, we live with it in our individual lives, right? You get these explanation of benefits associated with healthcare services, and you have to look at it and figure out, did they charge me for the right thing? No different than going to a restaurant and seeing whether or not there's an extra order of french fries on the bill. Somebody has to look at those bills and police them. Somebody has to make sure that the right charges are being charged to the right person and that the right scheduling of costs. That doesn't happen by itself. Yes, there are rules that govern both providers and what they're supposed to bill. And there are rules governing insurance companies as what they're supposed to pay. But those rules need to be monitored and they need to be managed. And Zurich has spent a massive amount of money setting up an entire operation that takes in this information and will then have a, interact with the patients, make sure they get the medical care, and look at the bills. And make sure that the right amount is being paid. And they had what's called a gain sharing arrangement, or a shared savings model. Where Trend would keep 75% of savings accomplished through Zurich's efforts at policing these bills. And Zurich would keep 25%. There's nothing wrong with this. It was disclosed. The broker's testimony at trial, Mark Denman, testified that he was aware of it. It's in the written materials, the proposals that are bound. It is mentioned as in the definition of ALAE, the loss adjustment expense, in both the program agreements and the underlying policies. And it was described in at least annual publication that went to the insured or the insured's broker. That would then describe the medical cost containment program. So, and there's a suggestion that it's unconscionable. But it's actually consistent with industry standard. Joseph Petuta, an expert in medical cost containment, testified at trial that, in his experience as an expert in the medical cost containment industry, it was industry standard to charge 25% of savings as the metric for valuing this service. There certainly are other ways to charge for this service. You could do it per phone call, per bill, per day, per month. But they chose what's called a contingency fee arrangement, 25% of savings. There's nothing unconscionable about it. Can you address the straight-up argument, not the unconscionability argument, but that because it doesn't reduce liability, it's not actually a savings? It does reduce liability, Your Honor. That this is the argument that opposing counsel makes, that it doesn't reduce liability because they never have to pay more. You never have, your client, never pay more than the stated rate. And so it doesn't have any practical effect. And because it doesn't reduce liability, it's not a savings. Explain why that's wrong. Thank you, Your Honor. It is wrong because the savings doesn't materialize unless there's effort, unless there's knowledge, unless there's systems, processes, and technologies. How does the savings materialize if you never have to pay more than the rate anyway? Because hundreds of bills come in the door. They all have numbers on them. And they would get paid unless someone spends time and energy and uses knowledge and computer systems to figure out which ones are wrong, which ones are too high, which ones didn't comply with this regulation or that regulation. It's 50 states' worth of bills. So it's just management of the incoming bills to make sure they're being at the right rate? That's correct. Right rate, right person, right service, right code number. And that's what we do. And one of the attributes they're looking for is, is it consistent with Nebraska or Colorado's or Arkansas's fee schedule? They have limits. And so when those are identified, yes, they are identified, flagged. You call the provider and they say, oh, sorry, we screwed up. Sorry, we'll fix that bill and send you another one. I would submit that that's a savings. Because they don't police themselves. Your Honor, the bankruptcy court heard a great deal of testimony, including from Dr. Nina McElry, a medical doctor who is Zurich's head of the cost containment practice. She described the system that Zurich uses to review these medical bills and make sure that they are paid at an appropriate amount that minimizes both the cost for the largely self-insured employer and make sure medical providers get paid and make sure the injured workers get the medical care that they need. It is an extensive and impressive operation that Zurich runs. But they didn't have to use Zurich. They could have outsourced this to somebody else. And somebody else would have likely charged them the industry standard rate, 25% of savings. It's a process that unfortunately in our third-party payor system needs somebody vigilant to monitor. The final analysis, Your Honors, this case was adjudicated by Judge Jernigan in a truly impressive manner. We were asked to do something very challenging, which was complete discovery, get expert reports, conduct a four-day trial with nine witnesses in a matter of 60 days. And we got it done. Judge Jernigan took a great deal of time and care and was not confused in any way. The amount of the allowed claim, roughly $7.6 million, deserves to be affirmed in its entirety, just like it was affirmed at the district court level, because it was correct. Moreover, the real issue is whether or not it was clearly erroneous with respect to the 502B determination or an abuse of discretion with respect to the 502C aspect. And it was neither. There's a substantial amount of evidence in the record. I would be happy to discuss it further, but my time is up. I ask you for you, I ask this court to affirm the award of the bankruptcy court. Thank you, Your Honor. Judge Oldham, I'll answer your question, but before that, let me take a couple of the easy issues first. We owe Zurich millions of dollars. We're not trying to run away from that, and we are paying them back $100. This is not a one-cent plan. This is not, we're trying to avoid our liability. And on this medical cost issue, this is an easy issue for me to respond to, because all you heard counsel say was, well it costs Zurich money to implement that program. Sure it does. That's the cost of doing insurance, complying with the law. That's why Zurich bills other clients $1 or $2 a bill to review. But Zurich chose to write its contract as it did, and Zurich wrote to say that that contract makes us obligated for 25% of savings to us. And we will not pay Zurich anything more ever than Zurich pays out. And Zurich will never pay anything more out than the law requires. And watch also the word games. There are instances where there are savings. There are instances when Zurich calls the hospital and says, hey, let's agree on bulk pricing. There are instances where Zurich's nurse calls the doctor and says, we don't need this, we need that. We're not contesting those. Again, our expert testified that about 87% was pure fee schedule. A nanosecond of computer time to comply with the law. And if Zurich wanted to shift the internal cost of that to us, we'll have drafted this document. All you have to look at is exhibit 11 in my record excerpts. It's a one page summary by bullet point of what Zurich is going to charge us. And that ends up being millions and millions of dollars. That's unconscionable, and it's not enforceable. Now to answer your question, Judge Oldham, and I think Judge Elrod, I'll get you to also answer your question. All you have to look at is tab six in my record excerpts. These are the Zurich claims. This is the proof of claim that it filed. This is what Zurich is telling the judge what is owed. It includes its estimate of future damages. And that amount is $6.2 million. So the first 20 or so are what's called TPD deductible. These are the ones where we pay in arrears, where the numbers are known. No problem, we owe those. We've never tried to say we don't owe those. Then it includes the $3 million of LRF, the lost retro fund, which is for future billings. So how do we get from Zurich themselves saying that the past and the future are 6.2, how do we get to 7.6? Double dipping. And then look at exhibit seven in my, or tab seven in my exhibits. This, Judge Elrod, is to your example. It's very hard, and I try to do the best I could succinctly in my brief to explain the walk forward, but for example, in tab seven, they're saying, well, you have to pony up $1.945 million into the LRF for this program year. And then once you do that walk forward, you get to the $3 million. I try not to be verbose, if that's the English word in my brief, but it was hard to do the walk forward. And once you do the walk forward, you'll see, as your witness has admitted at trial, as your contract states, the LRF is an estimate for future losses, for future losses. You don't get that estimate, that reserve, and an actual amount for future losses. Mr. Ferton talked about the bankruptcy trial, all these LRFs, LDFs. Fine, we don't need to go into that. The bankruptcy court rejected that methodology. The bankruptcy court rejected his $16 million, whatever it was, the bankruptcy court said futures are 1.7. It's very simple. You look at what were the actuals as of the claims trial, they're known with mathematical certainty, and you add 1.7, that's what you do. And if you really need to step back and think about it, or if I can be logical more than anything, we ended up paying Zurich over time about $10 million. Zurich ended up paying, as of the claims trial, out about $10 million. On top of that, Zurich is entitled to $2 million in premiums, no problem. And on top of that, the judge said 1.7 million for future losses. So the delta is closer to $3.7 million. It is not $7.6 million. And my example about how the claims went up 1,000% is absolutely true, because the only way, Mr. Opposing Counsel doesn't want to talk about the $4.6 million, but that's what the judge ended up awarding for the futures, because again, she awarded them the $3 million estimate of future losses in their invoices, and on top of that, $1.7 million. That's how you get to the $4.6 million. And to again answer your question, Judge Elrod, when opposing counsel was going through that invoice, we don't challenge all of the $3 million. I mentioned earlier, we need a remand. Not all of that $3 million is an estimate for future. Some of it is these things that we don't contest. Your Honors, thank you for your time and attention to this case. Thank you. This case is submitted.